UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ROSEMARY WHITE,

|  |  |  |
|---|---|---|
| | Plaintiff, | Civil Action No.: 12-cv-11600 |
| | | Honorable Mark A. Goldsmith |
| v. | | Magistrate Judge David R. Grand |

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]

Plaintiff Rosemary White brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.       RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") did not err in his Step Three analysis of White's impairments, and that remand under Sentence 6 of the Act for consideration of new evidence is not warranted. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, White's motion [14] be DENIED and that, pursuant to sentences four and six of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On May 19, 2009, White filed an application for DIB, alleging disability as of June 19, 2008.  (Tr. 126-27).   The claim was denied initially on September 3, 2009.  (Tr. 84-87). Thereafter, White filed a timely request for an administrative hearing, which was held on May 12, 2010, before ALJ Paul Armstrong.  (Tr. 32-63).   White, represented by attorney David Gerard, testified, as did vocational expert ("VE") Annette Holder.  (*Id.*).   On June 2, 2010, the ALJ found White not disabled.  (Tr. 65-81).   On March 8, 2012, the Appeals Council denied review.  (Tr. 1-7).  White filed for judicial review of the final decision on April 9, 2012.  [1].

### B.   Background

#### 1.   *Disability Reports*

In a May 19, 2009 disability report, White reported that the conditions preventing her from working are fibromyalgia, disc disease, bilateral central canal stenosis and osteoarthritis. (Tr. 165).  These conditions cause "chronic pain throughout" White's body, limiting her ability to sit, walk and stand.  (*Id.*).   She also reported muscle weakness in her lower and upper extremities, muscle spasms, blurred vision, migraines, nausea, chest pain, bowel issues and difficulty remembering and concentrating.  (*Id.*).   White reported that in her previous work she had taken sick and vacation days due to her conditions, and that her job had been fairly lenient with her breaks and the time required to complete her tasks.  (Tr. 166).  She stopped working as a result of being laid off, but she subsequently could not return to work due to worsening of her symptoms.  (*Id.*).   White reported being treated by a number of doctors and being prescribed a long list of medications, including Ambien, Esgic-Plus for headaches, Lyrica for fibromyalgia and Kadian, Motrin and Neurontin for back and extremity pain.  (Tr. 169-75).

In a May 19, 2009 disability field report, the telephone interviewer noted that White had difficulty breathing, concentrating and answering, apparently because she was attacked by a bee during the telephone call.  (Tr. 180).  The interviewer also noted that White's concentration and answers were "slightly affected by illness, it seemed."  (*Id.*).  The interviewer remarked that White's language was "choppy" and asked the interviewer to repeat herself.  (*Id.*).

In a June 15, 2009 hand function questionnaire, White reported that both her hands are affected by her conditions, making writing difficult.  (Tr. 182).  She experiences pain, stiffness, weakness and cramping in her hands and has trouble opening and lifting objects.  (*Id.*).  She reported taking Lyrica, Tylenol or Aleve for her pain.  (*Id.*).  In a June 16, 2009 headache questionnaire, White reported experiencing daily headaches since a car accident in 1994, which were diagnosed as migraine and tension headaches.  (Tr. 183).  Her headaches last between 8 and 72 hours and cause throbbing pain, nausea/vomiting, sensitivity to bright light, poor concentration, irritability, scalp tenderness and muscle spasms in the head and neck region.  (*Id.*).  They are increased with sitting, driving, stress and thinking and relieved by taking Esgic-Plus, prescribed by her doctor.  (*Id.*).  White reported that her doctor also recommended bed rest in a dark, quiet room.  (*Id.*).

In a June 18, 2009 function report, White reported that upon waking she assesses her "discomforts and ailments."  (Tr. 184).  She reported that pain in her lower extremities makes it difficult to move about.  (*Id.*).  Her accomplishments vary from day to day due to her conditions. (*Id.*).  Some days she can do light housework, seek employment or engage in enjoyable activities, while on other days she cannot do anything.  (*Id.*).  Even on good days her activities intensify her pain and she has to lie down.  (*Id.*).  Prior to her conditions, she was able to care for her husband and grandchildren, work, sit and stand for periods of time.  (Tr. 185).  She cannot do

3

those things now.  (*Id.*).  Her conditions affect her ability to remain asleep, due to pain waking her.  (*Id.*).  White reported being able to cook simple meals daily, and engage in light cleaning and laundry.  (Tr. 186).  She cannot perform yard work.  (Tr. 187).  She goes outside "as much as [her] disability allows" and is able to drive and ride in a car.  (*Id.*).  She shops for groceries and household items approximately twice a month.  (*Id.*).

White reported that her hobbies include watching television, garage sales and sunbathing, though she does not engage in them now due to pain.  (Tr. 188).  She has difficulty maintaining attention watching television due to pain.  (*Id.*).  She talks on the phone daily and visits her son and grandchildren once or twice a month.  (*Id.*).  White's conditions interfere with her ability to lift, squat, bend, stand, reach, walk, sit ,kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions and use her hands.  (Tr. 189).  She reported only being able to lift three pounds and pay attention for two to five minutes.  (*Id.*).  She follows written instructions fairly well, but not spoken instructions because she "cannot retain them." (*Id.*).  She reported not handling stress or changes in her routine well.  (Tr. 190).

In a November 21, 2009 disability appeals report, White reported no changes in her condition since her initial report.  (Tr. 207).  She reported receiving additional treatment for back and neck pain since her last report, but reported no new medications.  (Tr. 208-209).  She reported that her conditions make it difficult to shower or dress, so that she does not do these things most days.  (Tr. 210).  In a March 10, 2010 recent medical treatment questionnaire, White reported that one of her doctors recommended she seek a neurosurgeon to evaluate her conditions.  (Tr. 216).  She also reported being prescribed additional medications, including Darvocet and Flexeril for back pain and muscle spasms.  (Tr. 217).

4

2.      *Plaintiff's Testimony*

At the hearing, White testified that she was let go from her job during a layoff.  (Tr. 41). While she was not the only one to be laid off, she believed she was the only full-time employee, and she felt that it was because she had not been able to perform her job "at a hundred percent" due to her leg and back issues.  (Tr. 41-42; 57).   White testified that her lower extremity problems make it difficult for her to sit or stand for more than 45 minutes on good days.  (Tr. 43).  She can only walk 5-10 minutes before she tires and her legs hurt.  (Tr. 50).  At that point she must rest 2-5 minutes before trying again.  (*Id.*).  She testified she cannot sit for an eight-hour period due to pain.  (*Id.*).  She has trouble lifting a gallon of milk.  (*Id.*).  Her fibromyalgia causes her to be sore over her entire body.  (Tr. 53).  She relieves this pain with rest and heat. (Tr. 54).  She also experiences muscle spasms, shin pain, burning in her extremities, and headaches.  (Tr. 43-44).  She experiences migraine headaches 2-3 times a month, which require her to rest in a dark room.  (Tr. 52-53).  These headaches can last from 8-72 hours.  (Tr. 53).

White testified that she has tried physical therapy for her back and extremities but she did not progress.  (Tr. 44).  She also testified that she takes Lyrica, which helped at first, but is not helping as much now.  (Tr. 50-51).  She testified that she had lost weight in 2008, but had since gained it back due to the Lyrica.  (Tr. 52).

White testified that she lives with her sister.  (Tr. 46).  She does not go out often, and can only cook simple meals.  (*Id.*).  She tries to help with housework but has trouble bending and lifting.  (Tr. 46-47).  She does laundry when needed, but mostly stays in her pajamas.  (Tr. 47-48).  She no longer engages in her hobbies of going to garage-sales and window shopping, but will occasionally visit her son to see her grandchildren.  (Tr. 48).  On good days she spends approximately 3 hours out of an 8-hour day in bed.  (Tr. 55).  On bad days she will be in bed all

day.  (*Id.*).  She testified that she has 2-3 good days a week.  (Tr. 56).

### 3.   Medical Evidence

White does not argue that the ALJ erred in his Step Two determination of her severe impairments.  Thus, her medical records will be discussed only as they relate to those impairments found severe.  White also argues that this case should be remanded back to the ALJ for consideration of new evidence, not only as it relates to the conditions the ALJ found severe, but also as it relates to gastrointestinal discomfort, as subsequent to the ALJ's decision White was diagnosed with pancreatic cancer.  Therefore, the court will also discuss evidence relating to her abdominal pain and discomfort.

### a.   Treating Sources

### i.   Degenerative Disc Disease, Osteoarthritis and Fibromyalgia

A June 5, 2008 EMG and nerve conduction study of White's upper extremities was within normal limits.  (Tr. 235).  White was treated by rheumatologist Dr. James Lesser on July 3, 2008.  (Tr. 354-356).  She complained of pain everywhere, chronic fatigue by 10 a.m., and insomnia.  (Tr. 354-55).  Upon examination, White's musculoskeletal system was found to be normal except with a number of positive trigger points.  (Tr. 355).  There were "[n]o other abnormalities of inspection, [range of motion], Stability, Strength/Tone of arms or legs."  (*Id.*).  White was diagnosed with fibromyalgia, labs were ordered, and she was prescribed Elavil and Feldene.  (Tr. 356).  An August 1, 2008 bilateral knee MRI revealed a small osteophyte formation in the patella of White's right knee, but otherwise no significant abnormality, and no abnormality in her left knee.  (Tr. 247).  An August 1, 2008 cervical spine x-ray revealed "mild – moderately prominent degree of osteoarthritis and degenerative disc disease between C4-C5 and C5-C6."  (Tr. 262).  An August 7, 2008 bone density scan revealed mild osteopenia of the left

femoral neck with normal findings in the lumbar spine.  (Tr. 252).

White treated with Dr. Bharat Tolia on September 17, 2008.  (Tr. 238).  She reported pain in various parts of her body, including leg, back and hand pain, and weakness.  (*Id.*).  She reported having headaches 5-8 times a month.  (*Id.*).  She reported numbness in her feet and that she sometimes drops things when grasping with her hands.  (*Id.*).  She also reported taking Lyrica for her nerve pain and Ambien to help her sleep.  (*Id.*).  She reported being in a better mood since taking Lyrica, and that it also helped decrease the frequency of her headaches. White noted having lost 15 pounds in the last three months.  (Tr. 239).

Upon examination, Dr. Tolia noted no localized weakness in White's extremities, and no atrophy or fasciculation.  (*Id.*).  Her reflexes were symmetrical in all four extremities and no sensory abnormalities were noted.  (*Id.*).  She had a normal tandem gait and could walk on her toes and heels.  (*Id.*).  White's spinal range of motion was normal, and a straight leg raising test was negative.  (*Id.*).  Dr. Tolia did find tenderness in White's lumbosacral spine and over multiple areas of her body.  (*Id.*).  He diagnosed White with fibromyalgia, lumbosacral pain "non radicular by history," left lower extremity pain "rule out radiculopathy" and "[r]ule out carpal tunnel syndrome."  (Tr. 240).  He prescribed her Naprosyn, Lyrica, Ambien, Cymbalta, and Darvocet and recommended that she have an SSEP/EMG/nerve conduction study and an MRI of her lumbosacral spine.  (*Id.*).  At a September 29, 2008 follow-up, White reported continued pain in her lower limbs, but that her headaches had decreased to only two since her prior visit.  (Tr. 236).  An examination revealed no new findings.  (Tr. 236-37).  Dr. Tolia prescribed Rozerem, increased White's Lyrica dose, and changed her Esgic to Kadian.  (Tr. 237).

An October 10, 2008 MRI of White's lumbar spine revealed "[d]isc disease at the L3-L4, L4-L5 and L5-S1 levels with moderate central canal stenosis at the L4-L5 level."  (Tr. 241-42).

7

January 21, 2009 x-rays of White's knees showed "[n]ormal knees." (Tr. 266). A March 6, 2009 x-ray of White's left hip revealed a "[n]ormal left hip." (Tr. 282). A March 30, 2010 bone density scan revealed osteopenia. (Tr. 330).

In a March 31, 2009 treatment record from Dr. Michael Krivitsky, D.O.,[1] White complained of back pain, abdominal pain, nausea and wheezing. (Tr. 351). She was diagnosed with back pain and muscle pain.

White presented to the St. Joseph medical clinic on October 21, 2009, complaining of pain in her back, legs and shoulders. (Tr. 341-42). A neurological exam was normal. (Tr. 341). White was assessed with fibromyalgia and lower back pain. (*Id.*). She was prescribed physical therapy and referred to a pain clinic. (Tr. 342). She was ordered to discontinue Neurontin and her Lyrica was increased. (*Id.*).

A January, 26, 2010 treatment record from Dr. Krivitsky showed White complaining of muscle spasms in her lower back. (Tr. 344). She reported going to physical therapy. (*Id.*). Upon examination there was no tenderness. (*Id.*). She was diagnosed with chronic back pain, referred to neurosurgery, and prescribed Vicodin and Motrin. (*Id.*). A March 2, 2010 summary of White's physical therapy progress revealed that she was discharged from therapy after ten visits because her "progress has plateaued." (Tr. 346-350). The therapist commented that White "did well in therapy overall but has plateaued over the last three visits. Patient is stronger and has better range of motion. Patient continues to have pain and difficulty with all functional activities including, walking, standing, and sleeping. Patient is independent with Home Exercise Program." (Tr. 346). White's pain level upon discharge was a 3 at rest and a 4 with activity.

---

[1] While this record and several others like it originally appeared unidentifiable, subsequent records in this format were denoted as being from Dr. Krivitsky. (Tr. 357). However, it does not appear that the documents were identified as such at the time of the ALJ's decision, as the identifying information appears in records first submitted to the Appeals Council. (*Id.*).

(*Id.*).

At a clinic appointment on April 24, 2010, White complained of back pain and sought medication refills.  (Tr. 332-33).  She reported having low back pain for two weeks, after suffering an injury changing her sheets after a physical therapy session.  (Tr. 332).  A neurological examination was normal, with a negative straight leg raising test.  (*Id.*).  She was diagnosed with acute or chronic lower back pain that appeared musculoskeletal in nature, and fibromyalgia.  (Tr. 332).  She was prescribed Norco, physical therapy, and Flexeril, and would be referred to a pain clinic if the pain persisted after a follow-up visit.  (Tr. 333).

White presented to the clinic again on March 24, 2010, complaining of neck, shoulder, back and arm pain.  (Tr. 328-29).  She reported that physical therapy did help but that she "has a lot of cramps that [are] limiting her mobility."  (Tr. 328).  Upon examination, multiple tender points were noted and White was diagnosed with fibromyalgia, chronic pain syndrome, possible depression and osteopenia.  (*Id.*).  She was also found to have degenerative disc disease with moderate canal stenosis.  (*Id.*).  Physical therapy was recommended, as was a referral to a pain clinic.  (Tr. 329).

On April 5, 2010, White treated with Doctor of Chiropractic care, Larry Miller.  (Tr. 317-320).  Dr. Miller examined White, noting postural abnormalities of a right head tilt, left elevated shoulder and left elevated hip.  (Tr. 317).  He found limited range of motion in her cervical and lumbar spine, the latter with pain.  (*Id.*).  He performed a static scanning EMG which "showed signs of spinal imbalance in the cervical, thoracic and lumbar spinal levels."  (*Id.*).  He also conducted a thermography exam which revealed "abnormal temperature deviations".  (*Id.*).  X-rays taken revealed "vertebral subluxations at spinal levels – C1, C5, T1, T7, L1, L3, L4, L5, sacrum and pelvis."  (*Id.*).  Finally, the curvature of White's cervical spine had been reduced "to

9

a curve of 8 degrees as compared to a normal curve of 43 degrees." (*Id.*). Dr. Miller diagnosed White with "[s]pinal subluxations of C5, T1, L5, Sacrum and Pelvis with phase 1 & 2 degeneration and decay." (*Id.*). He opined that "[b]ased on the above findings, it is my opinion that Ms. White is suffering from chronic spinal subluxations caused from spinal trauma. Because of the chronicity of the subluxations and her symptom patterns, my opinion is that she is totally and permanently disabled from a return to gainful employment." (*Id.*).

White presented to the St. Joseph medical clinic on April 21, 2010, complaining of generalized body aches, left and right shoulder pain, and lower back pain. (Tr. 326-27). She reported no numbness or tingling, or urinary or bowel incontinence. (*Id.*). Upon examination, the doctor noted multiple tender points. (Tr. 326). White was diagnosed with fibromyalgia, chronic pain syndrome, osteopenia, drowsiness and a Vitamin D deficiency. (*Id.*). The doctor added Naproxen to her prescription regimen. (Tr. 327).

### ii.    *Headaches*

An MRI of White's brain on August 7, 2008 revealed a temporal cyst, and a "T2 signal abnormality in the left frontal subcortical white matter, likely related to chronic microvascular ischemic change," but no evidence of "acute ischemic infarct, intracranial hemorrhage, or abnormally enhancing space-occupying intracranial mass legion." (Tr. 249). Another MRI conducted on August 14, 2008, revealed the cyst, which was believed to be approximately three centimeters in diameter, but revealed no other findings. (Tr. 254). A November 30, 2009 appointment with Dr. Krivitsky revealed White complaining of a headache after running out of her medication, Esgic-Plus.

### iii.    *Abdominal Pain*

On May 14, 2008, White underwent a colonoscopy to remove several colorectal polyps

that had been causing her abdominal pain and gastritis.  (Tr. 255-257; 385).  The polyps were found to be benign.  (Tr. 256).  At a June 24, 2008 appointment with an endocrinologist regarding an unrelated thyroid issue, White reported a history of loose bowel movements but constipation more recently.  (Tr. 276).  Blood tests conducted on January 31, 2009, revealed a normal white blood cell count.  (Tr. 269).  At an appointment with Dr. Krivitsky on March 31, 2009, White complained of abdominal pain and nausea.  (Tr. 351).  An examination of her abdominal region showed no tenderness.  (*Id.*).  Blood tests conducted on October 23, 2009, revealed a normal white blood cell count.  (Tr. 339).  At medical clinic visits on October 21, 2009, February 24, 2010, and April 21, 2010, review of White's gastrointestinal system was normal.  (Tr. 326; 332, 341).  Examinations were also normal.  (*Id.*).  At a medical clinic visit on March 24, 2010, for joint pain, White reported having alternate bouts of constipation and diarrhea, but also that she does not tolerate Norco because it gives her cramps.  (Tr. 328).  An examination of her abdominal region revealed nothing unusual.  (*Id.*).

### b.    *Consultative and Non-Examining Sources*

White underwent a consultative examination with Dr. Mary Wood on August 28, 2009.  (Tr. 297-304).  White reported pain all over her body, including her long bones, her buttocks and down her right leg.  (Tr. 297).  She gave "a vague complaint of numbness in both legs worse on the right."  (*Id.*).  She reported being able to walk well, sit for long periods of time or bend or lift.  (*Id.*).  She reported that the pain was precipitated by coughing or sneezing, but she did not report any bowel or bladder problems other than diarrhea and constipation.  (*Id.*).  White also reported migraine headaches and insomnia, but that Esgic-Plus gives her relief.  (*Id.*).  She reported being fatigued, but better since being given sleeping pills.  (Tr. 298).  At the time of the examination, she was taking Ambien and Esgic-Plus, but had run out of Lyrica and Neurontin since the

11

previous June.  (*Id.*).  She reported having lost 14 pounds in the last year, and also suffering from

weakness.  (*Id.*).

Upon examination, White was found to be ambulatory with no assistive device, and her

cervical, dorsal, and lumbosacral spines revealed no "striking abnormalities."  (Tr. 299).  Dr.

Wood did note multiple tender points and a limited range of motion in White's cervical and

lumbosacral spine. (Tr. 300).  A neurological exam was normal.  (*Id.*).  She found White capable

of performing all daily activities, including, sitting, standing, stooping, bending, carrying,

pushing, pulling, and climbing stairs.  (Tr. 301).  She noted that White was also capable of

tandem walking and heel-toe walking, and that her gait was stable.  (Tr. 302).  Dr. Wood also

found White's abdomen to be soft and flat with "no tenderness, hernias, or audible abdominal

bruit."  (Tr. 299).  She diagnosed White with fibromyalgia, degenerative disc disease of cervical

and lumbosacral spine, and migraine headaches.  (Tr. 300).

A non-examining medical decision maker assessed White's residual functional capacity

("RFC") based on a review of the record.  (Tr. 307-314).  He found her capable of lifting 20

pounds occasionally and 10 pounds frequently, standing and/or walking six hours of an eight-

hour day and sitting for the same amount of time, with an unlimited ability to push and pull.  (Tr.

308).  She was able to occasionally crawl and climb ramps or stairs, frequently balance, stoop,

kneel and crouch, but never climb ladders, ropes or scaffolds.  (Tr. 309).

### c.    *Additional Evidence Submitted to the Appeals Council*

#### i.    *Records Dated Prior to the ALJ's Decision*

White submitted a number of additional records to the Appeals Council, some of which

were not incorporated into the record for unknown reasons.  White has proffered, with some

evidence, that documents attached to her motion for summary judgment were originally

submitted to the Appeals Council and the Commissioner does not dispute this claim. Thus, the Court will summarize not only the documents in the record, but also those attached to White's summary judgment motion.

White was treated by Dr. Krivitsky on September 5, 2006, complaining of, among other things, pain in "every bone" in her body. (Tr. 364). There is no indication of treatment for this complaint. (*Id.*). At a follow-up on May 14, 2007, White complained of periods of aches and pains in her arms, knees and neck. (Tr. 363). She was diagnosed with body aches and headaches and prescribed Esgic-Plus. (*Id.*). At a July 12, 2007 follow-up, White reported back ache and a distended stomach. (Tr. 362). Upon examination, her abdomen was found to be not tender and there were no masses. (*Id.*). An abdominal ultrasound was ordered. (*Id.*). The ultrasound, performed on July 13, 2007, revealed "[s]tatus post cholecystectomy with compensatory dilation of the common bile duct. Otherwise unremarkable abdominal ultrasound." (Tr. 376-77). It also revealed that White's "pancreas demonstrates a normal sonographic appearance." (Tr. 376).

White saw Dr. Krivitsky again on April 22, 2008. (Tr. 361). She complained of bowel movement trouble. (*Id.*). Upon examination her abdomen was non-tender, but mildly distended and there were no masses. (*Id.*). At an April 23, 2008 follow-up, the doctor ordered a CT scan of White's abdomen and pelvis, as well as a colonoscopy. (*Id.*). At this appointment, White also complained of right knee and hip pain and of arm and wrist pain, as well as a yeast infection. (*Id.*). An EMG was ordered. (*Id.*). Blood tests conducted on May 3, 2008, noted an elevated white blood cell count. (Tr. 365). A May 3, 2008 CT scan of White's abdomen revealed a cholecystectomy and a possible hepatic cyst. (Tr. 374-75). The scan noted a normal pancreas. (Tr. 374).

At a May 8, 2008, follow-up, the CT scan was reviewed. (Tr. 360). White also

complained of headaches during her menstrual cycle, and right arm and knee pain. (*Id.*). Upon examination, her abdomen was found to be mildly diffuse and tender. (*Id.*). The doctor noted that White had not yet had the EMG or colonoscopy. (*Id.*). White saw another unidentified doctor on May 8, 2008, complaining of abdominal pain with a change in bowel movements including constipation. (Tr. 387). At a follow-up with Dr. Krivitsky on May 23, 2008, the doctor reviewed White's colonoscopy and CT scan. (Tr. 359).[2] Upon examination, White's abdomen was not tender. (*Id.*). White saw the unidentified doctor on May 21, 2008, complaining of upper right quadrant pain. (Tr. 387). The doctor noted possible irritable bowel syndrome and suggested a recheck in six months or as needed. (*Id.*). White saw Dr. Krivitsky again on July 29, 2008, for a follow-up. (Tr. 358). She complained of knee pain and headaches every day. (*Id.*). Upon examination, White had a normal range of motion in her knees and no swelling. (*Id.*). She was diagnosed with osteoarthritis and given Tylenol. (*Id.*). Dr. Krivitsky also ordered knee x-rays and an MRI of White's brain. (*Id.*). An August 1, 2008 x-ray of White's lumbar spine revealed "[m]ild osteoarthritis and degenerative disease lower lumbar spine mostly L4-L5." (Tr. 402). At a follow-up on August 13, 2008, Dr. Krivitsky noted a cystogram, although it is difficult to tell whether it had already been performed or was to be ordered. (Tr. 357). He also noted that they reviewed White's MRI and x-rays of her lumbar spine and knees. (*Id.*). They discussed how Tylenol was not helping her pain. (*Id.*). Upon examination, White's range of motion and strength were normal. (*Id.*).

White saw the unidentified doctor on May 21, 2009, a year after her last appointment. The notes are fairly illegible, but it appears she was discussing her musculoskeletal pain. (Tr. 387).

---

[2] Another record appears to show that White had a colonoscopy on May 14, 2008, but does not reveal any results. (Tr. 385).

A May 8, 2010 MRI of White's left shoulder, ordered by Dr. Krivitsky, revealed "[m]oderate osteoarthritic degenerative change of the acromioclavicular joint with associated impingement upon the underlying musculotendinous junction of the supraspinatus" as well as a "mild associated supraspinatus tendinosis/partial tear." (Tr. 368).

ii.      *Records Dated After the ALJ's Decision*

On June 9, 2010, White was prescribed a cane for walking. (Plf. Brf. Ex. 1). At a visit with an unidentified doctor on June 23, 2010, White complained of abdominal pain and burning, along with rectal pain. (Tr. 387). The rest of these notes are illegible. (*Id.*). White entered the emergency room on June 26, 2010, complaining of neck, arm and leg pain. (Tr. 389). Upon examination, White did not appear to be in any discomfort. (*Id.*). Her abdomen was soft and non-tender. (*Id.*). She had a full range of motion in all extremities, and no tenderness. (*Id.*). White requested an MRI of her shoulder, but the doctor declined, saying there was "no emergent indications" for it. (*Id.*). The doctor also noted that White had had an MRI performed on her left shoulder only the previous month. (Tr. 391). She was diagnosed with cervical radiculopathy, musculoskeletal in nature and the doctor recommended monitoring. (Tr. 391-92). On July 14, 2010, White underwent an endoscopy and a colonoscopy as a result of reports of abdominal pain, heartburn and rectal issues. (Tr. 384). Multiple polyps discovered in the rectum and sigmoid colon were removed. (Tr. 394). They were identified per biopsy as hyperplastic polyps. (Tr. 396). There was also some inflammation in the propyloric area of her stomach and her duodenum, diagnosed as mucosa showing no histological abnormality. (*Id.*; Tr. 396). On July 26, 2010, White treated with Dr. William Gonte. (Tr. 388). She complained of migraines, gastroesophogeal reflux disease, and fibromyalgia. (*Id.*). She reported having stopped taking Lyrica. (*Id.*). The remainder of the notes are illegible. (*Id.*).

15

On August 3, 2010, White was examined by Dr. Hima Challa for the State of Michigan Department of Human Services. (Plf. Brf. Ex. 4). Dr. Challa stated that she had first examined White two years prior, although there is no evidence of Dr. Challa's prior examination in the record. (*Id.* at 1). Upon examination, White was found to have a painful gut and generalized point tenderness in all her joints. (*Id.* at 1-2). She noted a reduced range of motion in White's right knee. (*Id.* at 4). She noted impaired sleep, abnormal posture, tenderness, trigger points and muscle spasms. (*Id.*). However, a straight leg raising test was negative, and White was found to have a normal gait and normal senses and reflexes. (*Id.*). She was also found to be depressed. (*Id.* at 2). Her condition was considered to be stable. (*Id.*). Dr. Challa diagnosed White with fibromyalgia, polyarthralgia, degenerative disc disease, tobacco abuse, osteoarthritis, and central canal stenosis. (*Id.* at 4). She issued White physical limitations, finding her only capable of lifting less than 10 pounds frequently, standing or walking less than 2 hours in an eight-hour day and sitting for the same amount of time. (*Id.* at 2). In another portion of her report, she found that White could only lift less than 5 pounds occasionally. (*Id.* at 8). White could only sit for 15 minutes at a time before needing to stand and could stand for the same amount of time before needing to lie down. (*Id.* at 5-7). When sitting, White's legs needed to be elevated. (*Id.* at 6). She also found that White needed a cane for walking. (*Id.* at 2). Dr. Challa found that White would need additional rest periods up to three hours a day, beyond those allotted by a work environment. (*Id.* at 6). In one portion of her report she found that White could use both hands for repetitive actions, but in another portion she found that White was restricted in the use of her hands. (*Id.* at 1, 8-9). In one portion of her report Dr. Challa found no mental limitations. (*Id.* at 3). However, in another portion she found that White's psychological factors affected her pain and her pain frequently affected her ability to concentrate and pay attention. (*Id.* at 5). She also

16

found that White had a moderate limitation in her ability to deal with work stress. (*Id.*). Finally, she found that White could meet her needs in the home. (*Id.* at 4). Dr. Challa reported that White's conditions had existed necessitating these restrictions since June 2008. (*Id.* at 10).

On September 7, 2010, White was examined by Dr. Thomas Rosenbaum, a licensed psychologist. (Plf. Brf. Ex. 5). White reported having trouble with mood regulation and memory. (*Id.* at 1). She reported not having had previous mental health intervention, except some counseling with her son years prior. (*Id.*). Upon examination, Dr. Rosenbaum noted that White appeared "very tired and worn." (*Id.* at 4). She was in contact with reality, but had impaired self-esteem. (*Id.*). She had slow motor activity and appeared sleep-deprived. (*Id.*). She reported experiencing frequent crying episodes and that she is often isolated. (*Id.*). Her mood was depressed, her affect flat, blunted and "burned out." (*Id.*). White could remember six items forward and three backward, and recall 2 of 3 objects after three minutes. (*Id.* at 6). She could name four past presidents and four of five large cities correctly. (*Id.*). She was able to perform 2 serial seven calculations and three other mathematical calculations correctly, and was able to think abstractly, compare objects and exhibit proper judgment. (*Id.*). The doctor opined that her anxiety, depression and mild agoraphobia could be the result of brain trauma sustained in a 1994 motor vehicle accident. (*Id.*). He diagnosed her with major depressive disorder, recurrent, moderate, anxiety disorder with panic episodes, and cognitive disorder not otherwise specified. (*Id.* at 8). He found she was experiencing severe psychosocial stressors. (*Id.*). He assessed her with a Global Assessment of Functioning score of 45 and gave a poor to guarded prognosis. (*Id.*).

On January 21, 2011, White underwent a CT scan of her abdomen after a pancreatic mass was discovered on a previous CT scan performed on November 17, 2010. (Plf. Brf. Ex. 6 at 4).

17

On March 2, 2011, White underwent surgery to remove a mass on her pancreas that was diagnosed as an "islet cell tumor of the pancreas." (Plf. Brf. Ex. 6 at 1).

### 4.    *Vocational Expert's Testimony*

VE Annette Holder testified that White's past relevant work consisted of assembler, which was classified as light and unskilled, switchboard operator, which was sedentary and semiskilled, cashier, which was light and semiskilled, vendor service representative, which was light and skilled but sedentary as performed, and receptionist, which was sedentary and semi-skilled. (Tr. 60). The ALJ then posed a hypothetical to the VE asking whether a person who was limited to sedentary occupations would be able to perform White's past work. (*Id.*). The VE testified that she would. (*Id.*). The ALJ then asked if the answer would be the same if the hypothetical claimant could only lift five pounds. (*Id.*). The VE testified that the answer would not change. (*Id.*). The ALJ then asked whether such work would be available if the hypothetical claimant was limited to simple, unskilled work. (*Id.*). The VE testified that such a limitation would preclude White's past work. (Tr. 61). He then asked if the need to take additional rest breaks of an hour or absences of more than two days a month would eliminate those jobs. (*Id.*). The VE testified that these limitations would eliminate White's past work. (*Id.*).

### C.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

18

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at \*21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that White was capable of returning to her past work and thus was not disabled under the Act.  At Step One, the ALJ determined that White had not engaged in substantial gainful employment since her alleged onset date.  (Tr. 70).  At Step Two he found the following severe impairments:  "fibromyalgia, degenerative disc disease, and chronic headaches."  (*Id.*).  He found that White's impairment of

"blurry vision," which was possibly the result of a diagnosed cataract, did not rise to the level of a severe impairment.  (*Id.*).   At Step Three, the ALJ determined that none of White's impairments, either alone or in combination, met or medically equaled a listed impairment.  (Tr. 71).   In analyzing the evidence at Step Three, the ALJ looked specifically at Listing 1.04 (Disorders of the Spine) and Listing 14.06B (Undifferentiated and mixed connective tissue disease).  (*Id.*).   Next, the ALJ assessed White's RFC, finding her capable of the full range of sedentary work.  (Tr. 71-75).   The ALJ concluded his analysis at Step Four, finding that based on her RFC, White was capable of performing her past work as a switchboard operator, receptionist or vendor services representative.  (Tr. 75).   Thus, White was not disabled under the Act.  (Tr. 76).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

White makes two arguments as to why this case should be remanded back to the ALJ. First, she argues that the ALJ erred at Step Three in his evaluation of her fibromyalgia under the listings.   Second, she argues that remand is warranted under Sentence 6 of the Act for

consideration of new evidence.  The Court addresses each argument in turn.

          *1.*     *The ALJ's Step Three Analysis*

      White argues that the ALJ erred at Step Three by improperly analyzing her fibromyalgia

under the listings.  In support of her argument, she cites Social Security Ruling 12-2p, Evaluation

of Fibromyalgia, which states that ALJ's should determine whether a claimant's fibromyalgia

meets a listing, and since there are no specific listings for fibromyalgia, one to consider is Listing

14.09D (Inflammatory Arthritis).  SSR 12-2p, 2012 SSR LEXIS 1 (July 25, 2012).  Listing

14.09D requires:

> Repeated manifestations of inflammatory arthritis, with at least two of the
> constitutional symptoms or signs (severe fatigue, fever, malaise, or
> involuntary weight loss) and one of the following at the marked level: (1)
> Limitation of activities of daily living; (2) Limitation in maintaining social
> functioning; and/or (3) Limitation in completing tasks in a timely manner
> due to deficiencies in concentration, persistence, and pace.

20 CFR Pt. 404, Subpt. P, App. 1, Listing 14.09D.  White argues that had the ALJ considered

this listing, he would have found that she met it, based on the evidence of record.

      White's argument fails for a few reasons.  First, SSR 12-2p was not effective until July

2012, and thus was not available for the ALJ to consider when he rendered his opinion in June

2010.  *See* SSR 12-2p, 2012 SSR LEXIS 1 (July 25, 2012).  White offers no authority from

which this Court could conclude that the ALJ erred by failing to consider a social security ruling

that was not issued or in effect at the time of his decision.  Second, White overstates the import

of SSR 12-2p.  SSR 12-2p does not require an ALJ to consider any specific listing, but simply

requires him or her to consider a claimant's fibromyalgia against a relevant listing, citing Listing

14.09D as one such example.  *Id.* at *16 ("At step 3, therefore, we determine whether [the

claimant's fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for

inflammatory arthritis)…" (parenthesis in original)).  Therefore, the ALJ did not err simply

22

because he chose to compare White's condition against certain a Listing other than 14.09D.

Moreover, based on the evidence before the ALJ, White's fibromyalgia would not meet listing 14.09D. In order to "medically equal" a listing, a claimant's condition must be at least equal in severity and duration as the impairment in the listing. 20 C.F.R. § 404.1526(a). Here, while White's fibromyalgia is considered an inflammatory disease,[3] and thus may be aptly compared to Listing 14.09D (Inflammatory Arthritis), the records she cites to support her argument, (Tr. 262, 357, 358, 389, 402 [and Doc. #14-4 at 4]), relate not to her fibromyalgia, but to her "osteoarthritis," which is non-inflammatory. *See* Dorland's Illustrated Medical Dictionary, 1199 (28th ed. 1994) (defining "osteoarthritis" as "noninflammatory degenerative joint disease…").[4] Furthermore, two of the records on which White relies specifically describe her osteoarthritis as "mild." (Tr. 262, 402). In addition, White fails to satisfy the other criteria necessary to meet or medically equal this listing. The ALJ's assessment under listing 14.06B included similar criteria to that required by 14.09D, in that it required the ALJ to assess whether White suffered from severe fatigue, malaise, fever or involuntary weight loss, and whether she suffered a marked limitation in activities of daily living, social functioning and concentration, persistence and pace. 20 CFR Pt. 404, Subpt. P, App. 1, Listing 14.06B; *cf.* Listing 14.09D requirements, supra at 22. Here, the ALJ found that there was insufficient medical evidence to support the conclusion that her condition met these criteria. (Tr. 71). That finding is supported

---

[3]*See e.g. Benecke v. Barnhart*, 279 F.3d 587, 589 (9th Cir. 2004) (citing authorities that fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connection tissue components of muscles, tendons, ligaments, and other tissue."

[4] As the Commissioner correctly notes, rheumatoid arthritis is an inflammatory condition. *Id.* at 1459. However, one of the very records on which White relies specifically indicates that she does not have rheumatoid arthritis. (Tr. 358) ("told she doesn't have rheumatoid arthritis."). While fibromyalgia is also an inflammatory condition, the records upon which White relies to support her argument that the ALJ should have considered listing 14.09D relate to her osteoarthritis, not to her fibromyalgia.

23

by substantial evidence and White does not directly challenge that finding.   Thus, even if the ALJ had assessed White's fibromyalgia against Listing 14.09D, his analysis would have eliminated her from meeting or medically equaling this listing based on his assessment of her condition under listing 14.06B.  Therefore, the ALJ did not err in his Step Three analysis.

2.     <em>Consideration of New Evidence</em>

White argues that this case should be remanded for the consideration of new evidence. She specifically cites the records of Dr. Krivitsky that were not submitted to the ALJ despite having been in existence at the time of the hearing.  She also cites the records of Drs. Rosenbaum and Challa, which were generated after the date of the ALJ's decision, but which White argues are nevertheless relevant to her condition during the period in question.  Finally, she argues that in light of her 2011 pancreatic cancer diagnosis, the ALJ should consider the record evidence of abdominal discomfort and bowel issues.  White's arguments lack merit.

Remand to the ALJ for the consideration of new evidence is only appropriate where the evidence is material, and where good cause is shown as to why it was not presented at the prior proceeding.  42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).  The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

First, with regard to the medical evidence White submits that pre-date the ALJ's decision, including Dr. Krivitsky's records, White has not demonstrated that the evidence is either new or

24

that good cause exists for her failure to submit it previously.  In her brief, she concedes that despite being represented at the hearing by counsel (albeit different counsel than is currently representing her), she did not know why Dr. Krivitsky's records were not submitted, citing the possibility that there was difficulty in obtaining them.  (Plf. Brf. at 2 n.1).  However, as demonstrated in the discussion of the evidence above, some of Dr. Krivitsky's records and tests that he ordered were part of the record before the ALJ, which belies new counsel's speculative explanation.  Because White has failed to satisfy the "good cause" requirement, the Court need not further address whether Dr. Krivitsky's additional records would be considered material.  *See Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (finding that failure to satisfy "good cause" requirement prevents court from remanding case even if new evidence is deemed material); *see also Robinson v. Sec'y of Health & Human Servs.*, No. 90-2304, 1991 U.S. App. LEXIS 10743 at *6 (6th Cir. May 15, 1991) (same); *Brown v. Comm'r of Soc. Sec.*, No. 10-12960, 2011 U.S. Dist. LEXIS 136050 at *11-12 (E.D. Mich. Nov. 28, 2011) (evidence that is new and material nevertheless does not warrant remand where good cause is not established).

Second, with regard to the records generated after the ALJ's decision, while the date of these records would certainly render them "new," the "mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 725 (6th Cir. 2012).  A claimant must "detail[ ] the obstacles that prevented the admission of the evidence." *Id.*  The Sixth Circuit has said it takes a "harder line" on the good cause test, and requires that a claimant "give a valid reason for his failure to obtain evidence prior to the hearing." *Id.*  Here, White fails to give good reasons why the evidence she seeks to admit now could not have been obtained and

25

admitted previously.

With regard to Dr. Challa's evaluation, White admits that Dr. Challa had evaluated her previously in 2008, but there are no treating or evaluating records from Dr. Challa in the file, and there is no explanation why his 2010 evaluation and source statement could not have been obtained earlier.  Similarly, with regard to Dr. Rosenbaum's evaluation of White, she fails to explain why she could not have sought the evaluation of a mental health professional earlier if she was suffering from depression symptoms.

Finally, with regard to the diagnosis of pancreatic cancer, this diagnosis came more than a year after the ALJ's decision, and even though it could possibly satisfy the good cause test (since it could not have been submitted earlier as it did not exist), it fails to satisfy the test for materiality.  As noted above, repeated examinations of White's abdominal region between 2008 and 2010 showed no abnormalities.  (Tr. 326, 328, 332, 341, 351).  Blood tests in January and October 2009 revealed a normal white blood cell count.  (Tr. 269, 339).  Even among the new medical records White submitted to the Appeals Council there is little evidence supporting symptoms of pancreatic cancer before the ALJ's decision.  A 2007 abdominal ultrasound was unremarkable as it related to her pancreas.  (Tr. 376-77).  A 2008 abdominal CT scan showed a normal pancreas.  (Tr. 374).  While blood tests in May 2008 revealed a higher than normal white blood cell count, other records show White was suffering from a yeast infection during that time.  (Tr. 361, 365).  And subsequent blood tests showed normal results, as noted above.  Moreover, the abdominal discomfort that White experienced during the relevant period could have related to any number of other conditions, including her repeated colon and rectal polyps.  (Tr. 255-57; 384-85; 394-96).

Evidence can only be considered material where there is a reasonable probability it would

have changed the ALJ's decision. *Sizemore*, 865 F.2d at 712. Here, remand here is unwarranted because there is not a reasonable probability the ALJ would have attributed the abdominal discomfort White experienced during the disability period to a much-later diagnosis of pancreatic cancer, especially given the absence of objective medical evidence supporting those symptoms during the relevant period.

For all of these reasons, and because the Court finds that substantial evidence supports the ALJ's findings, his decision should be affirmed.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that White's Motion for Summary Judgment **[14]** be **DENIED**, the Commissioner's Motion **[17]** be **GRANTED** and this case be **AFFIRMED**.

Dated: June 27, 2013              s/David R. Grand
Ann Arbor, Michigan              DAVID R. GRAND
                                 United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to

27

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 27, 2013.

s/Felicia M. Moses           
FELICIA M. MOSES
Case Manager
